IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   12-cv-00702-WYD-KMT

MARLA J. JACOBSON,

      Plaintiff,

v.

ADAMS 12 FIVE STAR SCHOOLS,

      Defendant.

---

## ORDER ON SUMMARY JUDGMENT

---

I.    <u>INTRODUCTION</u>

      This matter is before the Court on Defendant Adams 12 Five Star Schools ["School District"] Motion for Summary Judgment, which is fully briefed.  The School District seeks summary judgment on Plaintiff's claims that it discriminated against her in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* ["ADA"] as retaliation for her filing a complaint of disability discrimination with the Equal Employment Opportunity Commission ["EEOC"] in January 2010.  (Compl. ¶ 3.)

      The School District argues that Plaintiff cannot adduce sufficient evidence to establish a prima facie case of retaliation or establish that its legitimate nondiscriminatory reasons for the actions it took were a pretext for discrimination.  Further, it argues that the undisputed facts establish that the School District has not taken an employment action against Plaintiff based on any impermissible motive.  Finally, the School District argues that if summary judgment is denied on the merits of

the claims, Plaintiff's claims for compensatory and punitive damages must be denied because such damages may not be awarded.  Plaintiff argues generally in response that the parties present two radically different versions of the events at issue and that this establishes that material issues of fact remain to be determined.

II.    STATEMENT OF FACTS

The parties have cited voluminous facts.  I have cited only those facts I deem most relevant, but have considered all the facts and evidence supporting them.  I will cite to the evidence only where there is a genuine dispute about the fact(s).

I note that Plaintiff responded to 129 of the School District's 138 paragraphs of undisputed facts with "Admitted", "Admitted but misleading; material facts are omitted" or "Denied because misleading; material facts are omitted".  To the extent Plaintiff asserted that material facts were omitted, she did not state what those were in her response to the School District's facts.  To the extent she sought to deny facts, she failed to provide a factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial as required by Section III.B.4 and 5 of my Practice Standards as well as Fed. R. Civ. P. 56(c).  These facts must thus be deemed admitted as there is no record evidence that supports the denial.

Further, Plaintiff cited 76 additional paragraphs of facts, in many instances citing only to her affidavit or that of her husband.  In evaluating these affidavits, I have kept in mind that "'[t]o survive summary judgment, nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'"  *Skrzypczak v. Roman Catholic*

*Diocese of Tulsa*, 611 F.3d 1238, 1244 (10th Cir. 2010) (quotation omitted).  Eleven of Plaintiff's cited paragraphs fail to cite material in the record to support the allegations, and are thus unsupported.  I now turn to the facts.

<u>The Parties</u>

The School District is a governmental entity that operates public schools in Adams County, Colorado.  It employed Plaintiff as an English as a Second Language ("ESL") teacher from August 28, 2008 through August 2011.

Plaintiff's post-graduate degrees include an MA in teaching and a Ph.D. in Educational Administration.  Her area of specialization for her doctorate was second language acquisition.  She holds a Colorado Professional Teacher's license and, at the time at issue, held a Colorado Professional Principal's license.  She wanted to be a classroom teacher because she prefers to work directly with students.[1]

From August 2008 through August 2010, Plaintiff was an ESL teacher at Malley Elementary School ("Malley").  From August 2010 to August 2011, Plaintiff was an ESL teacher at Silver Hills Middle School ("Silver Hills").

---

[1]  Plaintiff points out that during her 30 year career, she has been a classroom teacher, Dean of Students, Assistant Principal, Acting Principal, Head of School, Instructional Guide and District ELL Coordinator, and Adjunct Professor at the University of Colorado at Denver.  She claims to have extensive experience in staff development, the function of teaching and assisting teachers to be more effective.  She is classified as a "Trainer of Trainers" for second language acquisition by the Colorado Department of Education.  She has provided staff development for teachers in a number of locations statewide in second language acquisition theory and practice and in other areas.  She has led workshops in second language acquisition theory and practice at national conferences of the Association for Supervision and Curriculum Development and the National Staff Development Council.

<u>Plaintiff's Employment at Malley Elementary School</u>

During Plaintiff's first year of employment by the School District at Malley, Principal Anne Wesley ("Wesley") was aware that Plaintiff suffered from chronic pain which affected her normal activities.  Wesley permitted various accommodations, such as allowing Plaintiff to come in on weekends to perform planning activities and to arrive late on some mornings due to physical therapy.  Before commencement of the 2009-2010 school year, Plaintiff discussed schedule accommodations with Wesley, and they agreed upon a number of accommodations.

Shortly after the commencement of the 2009-2010 school year, Plaintiff learned that her hip prosthesis would have to be replaced, and that the surgery could not be delayed until a break in the school year.  The surgery was performed in late September of 2009.  (Resp. and Obj. to Mot. Summ. J. ["Resp."], Ex. 1.)  Plaintiff took leave from September 28, 2009, through December 18, 2009.

In late 2009, Plaintiff learned of two job postings within the district for Teacher on Special Assignment ("TOSA") positions with the Language Acquisition Support Services Department, for which she was qualified and had experience.  She applied for both positions.  Plaintiff was interviewed for one of the TOSA positions by telephone, and received a telephone message from Julie Dutch, Director of the Department, stating she would be interviewed for the other position after her return from a pain clinic.

After her return to work, Plaintiff discussed with Wesley the new physical therapy recommendations developed at that pain clinic.  These recommendations involved an uninterrupted morning "break" period of 45 minutes to allow for physical therapy.

Plaintiff asserts that Wesley refused the requested accommodation, and the School District and Plaintiff commenced a series of discussions as to other options for accommodation.  (Resp., Ex. 1.)  Plaintiff also asserts that the School District refused to agree to any scheduling accommodation within Malley, and offered no acceptable position for transfer.  Plaintiff contends that she requested transfer to the still-open TOSA position for which she had applied and for which she had been promised an interview.  In response, the School District denies that it refused to provided accommodations within Malley, citing to Exhibit A1 of the Response wherein it offered Plaintiff certain options providing accommodation.  As to the TOSA position, it is undisputed that Plaintiff applied for the TOSA position in 2009, that Plaintiff was not selected for the position, and that it remained open as of January 10, 2010.  (*See* Resp., Ex. 4.)  While Plaintiff asserts that the School District acknowledged that she was qualified for the position but refused to grant her the transfer, claiming that Plaintiff was not the "ideal" candidate, the exhibit she cites does not support this assertion.  (*Id.*)

<u>Plaintiff's First EEOC Charge and the Settlement Agreement</u>

In January 2010, Plaintiff filed a Charge of Discrimination ("2010 Charge") with the United States Equal Employment Opportunity Commission ("EEOC") seeking to enforce rights pursuant to the ADA.  This was filed due to the School District's alleged refusal to provide accommodation.

Plaintiff asserts that rather than provide accommodation, the School District placed her on medical leave for the remainder of the school year, citing her affidavit, Exhibit 1 to the Response.  Her affidavit is contradicted by Exhibit MM to the Reply,

which shows that Plaintiff requested leave, as her doctor "recommended continuing leave through the end of this school year." (*Id.*)  Plaintiff's request for a leave of absence was granted.  (*Id.*)

In July 2010, the School District offered Plaintiff a position at Silver Hills as an ESL teacher.  In reliance upon the School District's representation as to teacher planning periods being an integral part of teacher scheduling, Plaintiff agreed to give up seniority rights and medical leave privileges in exchange for the transfer to Silver Hills for the 2010-2011 school year.  In the summer of 2010, Plaintiff underwent a surgical procedure to repair her right shoulder.

The parties ultimately entered into a written settlement agreement to resolve the matters raised by the 2010 Charge.  The agreement included dismissal of the pending EEOC charges.

In the settlement agreement, the parties agreed Plaintiff would be employed as an ESL teacher at Silver Hills starting in August 2010.  The School District did not provide any information related to Plaintiff's 2010 Charge or the terms of the Settlement Agreement to Plaintiff's new supervisors at Silver Hills:  Principal Jami Miller ("Miller") and Assistant Principal Tim Griffin ("Griffin"), or to the Director of Language Acquisition, Julie Dutch ("Dutch").

Mark Hinson ("Hinson") testified that Silver Hills is one of the School District's newest middle schools.  He also testified that it was a "great place to work, good culture and climate in terms of leadership. . . ."  (Mot. Summ. J. ["Mot.], Ex. B at 16:21-17:6.) Plaintiff denies this, citing to Miller's testimony that Silver Hills was not in a real stable

state and that he was sent in as principal to "stabilize the school and get it kind of back on its feet and rolling." (Resp., Ex. 3 at 8:1-12.)  This does not, however, refute Hinson's testimony that Silver Hills was a good place to work or that it was a good culture and climate under the leadership of Miller.  It is undisputed that during the 2009-2010 school year, Miller was able to establish a team atmosphere and get the faculty and administration of Silver Hills working together.

<u>The August 2010 Meeting and Plaintiff's Duties at Silver Hills</u>

In August 2010, Plaintiff met with Silver Hills Principal Miller.  She stated in her affidavit that she told him of her condition, of the circumstances of the transfer, and of the agreement with the School District regarding her having planning periods as an accommodation.  (Resp., Ex. 1 ¶ 31.)  While she also asserts that she told Miller about the EEOC proceedings and the settlement, her affidavit does not reference that.  Miller testified that she told him there was a nonrenewal at her previous school, "there had been some settlement or arbitration or something" which led to her coming to Silver Hills, and that "there were some things set up within that needed to be met", including the "planning period situation".  (Def.'s Reply in Supp. of Mot. Summ. J. ["Reply"], Ex. LL at 21:2-8.)  However, he stated in his affidavit that he had not been informed of the circumstances leading to Plaintiff's placement at Silver Hills.  (Mot., Ex. C.)  He was only aware that Plaintiff was out for some time during the prior year and that mediation took place.  (*Id.*)  There is thus no evidence that Miller knew about the EEOC charge.

Plaintiff asserts that she requested accommodation regarding planning periods at the August 2010 meeting and Miller denied it, stating that there were no exceptions to

the school's rule that all teachers were required to perform "duties" beyond their classroom teaching schedules.  This included providing supervision for students at lunchtime.  The School District denies that the accommodation was requested, promised, or denied in August 2010.  Instead, Miller testified that upon showing her the schedule, Plaintiff thought the schedule would be fine and that the situation could be worked out.  (Reply, Ex. LL at 21:8-11.)  Plaintiff's schedule for the first semester of the 2010-2011 school year provided for two planning periods back-to-back with lunch.

When Miller posted a sign-up sheet for Silver Hills' teachers to indicate what non-classroom duties they preferred, Plaintiff signed up and got her first choice:  lunch supervision duty.  Plaintiff asserts that because she had been denied the promised accommodation, she chose the only duty that would allow her to attend physical therapy before and after school.  (Resp., Ex. 1.)

Plaintiff arrived late to lunch duty at least three times.  Griffin and the assistant principal held a pre-disciplinary meeting with Plaintiff because they were concerned she had failed to show up on time for lunch duties.  Plaintiff did not receive discipline or a warning about being late.   While Plaintiff asserts that she spoke with a teacher's union representative about this issue (Resp., Ex. 1 ¶ 42), the statements allegedly made by the representative are hearsay and are thus inadmissible.  As a result of the conversation, Plaintiff asserts that she began keeping her own "anecdotal record" of events at the school, beginning September 22, 2010.  (*Id.*)[2]

---

[2] While the School District objects to this last assertion as inconsistent with Plaintiff's testimony, I will allow it.  The inconsistency between the affidavit and deposition is not material, and I find it does not constitute an attempt to create a sham fact issue.  *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.

<u>Plaintiff's Allegations about Note Taking</u>

Plaintiff alleges in her affidavit that she has reviewed notes written by Griffin and Miller which "have no relation to my classroom performance, and are not the normal records kept by administrators to track teacher performance." (Resp., Ex. 1 ¶ 43.) She further asserts that "[s]uch records are only created and used to build a case for dismissing a teacher" and "[t]hey establish that Adams 12 planned to terminate my employment from the beginning of my assignment, no matter what I did in the classroom." (*Id.*) Defendant denies these allegations. While I accept Plaintiff's representation that she reviewed notes of Miller and Griffin, she did not attach a copy of the notes or even state what the notes said. Instead, she makes unsupported and speculative arguments about the meaning and purpose of the notes. Without a representation about what the notes actually said, however, I cannot accept Plaintiff's arguments. Further, she has no personal knowledge about the purpose of any notes made by Miller and Griffin. Thus, I reject the bulk of Plaintiff's allegations in this paragraph.

<u>Standards for Performance Appraisals</u>

Plaintiff's employment at Silver Hills was her second year as a probationary teacher in the School District. Colorado law provides: "During the first three school years that a teacher is employed on a full-time continuous basis by a school district, such teacher shall be considered to be a probationary teacher whose employment contract may be subject to nonrenewal, C.R.S. § 22-63-203(2)(a).

_____

1986).

The Personnel Appraisal System is described in Article 14 of the Master Agreement for School Year 2009-2010 between the School District and the union representing teachers in that district.  Probationary teachers are to be evaluated twice yearly in accordance with the Personnel Appraisal System.  Second year probationary teachers shall have a minimum of two observations for their first evaluation cycle and a minimum of one observation during their second evaluation cycle.  Observations and evaluations of teachers are the responsibility of administrators, who shall rate the teacher as "Satisfactory," "Satisfactory with Growth Needed", or "Unsatisfactory."  A "Satisfactory with Growth Needed" rating requires development of a written improvement plan.

The Licensed/Certified Performance Appraisal System for the School District incorporates Article 14 and outlines the following steps for evaluating a teacher's performance: (a) at the beginning of the school year, a classroom teacher and her administrator/ evaluator jointly prepare a "Pre-Appraisal Agreement" in which they agree on standard(s) and criteria to be the focus of the appraisal, specific objective(s) and strategies for achieving the objective(s); (b) administrators observe teachers in their classrooms formally (scheduled in advance) or informally (at any time); (c) if the observation is formal, or if the observation is informal and to be used as part of the evaluation, the administrator prepares a record ("Data Collection Conference Report") and discusses it with the teacher; (d) the evaluations are documented as a "Performance Appraisal Summary" that includes an overall rating and a narrative; and (e) if a teacher receives an overall rating of "Satisfactory with Growth Needed" on a

Performance Appraisal Summary, a written "Improvement Plan" must be developed by the teacher and administrator.

### Plaintiff's 2010-2011 Pre-Appraisal Agreement

Griffin was responsible for conducting Plaintiff's evaluations for the 2010-2011 school year.  Plaintiff and Griffin met on September 16, 2010 to prepare Plaintiff's Pre-Appraisal Agreement for the 2010 - 2011 school year.  They agreed upon and reduced to writing one stated objective or goal for the Agreement:  "use[ ] a variety of teaching methods appropriate to diverse learners and the environment."  They listed specific strategies to achieve that goal, including:  "Will familiarize herself with the Inside curriculum series for middle school students," "Will meet with Karen Caddoo to discuss planning curriculum and resources," and "Will network with other ESL teachers for input on technology."  Thus, one of the strategies was working with Karen Caddoo ("Caddoo"), the LASS coordinator assigned to Silver Hills.

### Training and IT support provided by the School District

The School District prepared a list of "Support Offered" at the end of September to document the training, help sessions and individual assistance and support it had provided to Plaintiff between August 16 and September 16, 2010.  It provided the support described in the list to Plaintiff

In addition, Caddoo held a planning meeting with Plaintiff in September 2010.  When Plaintiff had computer issues other than the log-in issues, people helped her resolve them fairly quickly.

<u>Language Acquisition Support Services ("LASS")</u>

LASS is a department of the School District that supports the district's schools in their efforts to educate English language learners and work with their families. LASS provides professional development training and works in and outside the classroom with ESL teachers who provide ESL instruction to students. LASS also makes sure that the district is in compliance with state and federal laws regarding education for English language learners.

In the 2010 - 2011 school year, Dutch was the Director of LASS. Caddoo was the ELL Coordinator from LASS assigned to work with Silver Hills for that school year. ELL Coordinators' primary purpose is to support schools in better meeting the needs of their English language learners through professional development, by delivering training, and also by going to schools and working with teachers in their classrooms.

Plaintiff had many contacts with Caddoo between August and October 21, 2010. When Plaintiff contacted Caddoo, Caddoo responded in a timely fashion and if she did not know the answer, she would try to get it.

Plaintiff complained to Griffin that Caddoo was not responsive to her requests. Plaintiff complained that Caddoo/LASS did not recreate green folders for Plaintiff when folders for some of her students could not be found. These folders are discussed in more detail below. Plaintiff also complained that Caddoo was not giving her the support she needed because Plaintiff did not find Caddoo's planning suggestions to be helpful, Caddoo was not able to help her purchase curriculum material, and she did not help Plaintiff test students to determine if they were properly placed.

Griffin looked into Plaintiff's complaint with LASS and concluded it was not justified.

<u>Green Folders</u>

The School District required individual schools to maintain onsite, for each ELL student, a green profile folder which was to contain a home language survey, a copy of the student's annual proficiency assessment, a copy of any paperwork such as a waiver, and possibly work samples to compare to show progress that students were making. The green folders contain demographic, assessment, and special needs information for ELL students.

Before the first day of school, Plaintiff told Griffin she could not locate the green folders for some of her students.[3] Griffin tried, but was unable to locate the green folders for Plaintiff. When the green folders were not found, Plaintiff asked Caddoo and the LASS Department to provide new green folders containing the information available to them, *i.e.,* to have LASS reconstruct the folders. She testified that when she was at Malley, students' green folders were reprinted for her. (Mot., Ex. I at 72:11-13.)

The LASS department did not have all of the information that was available in green folders. Plaintiff alleges that the folders could have been prepared without difficulty by LASS. Dutch testified that while central administration for the School District (including LASS) could collect information for the new folder, it would be a bit

---

[3] Plaintiff alleges that all green folders for her 7th and 8th grade students were missing. The School District denies this, stating that only some green folders could not be located. I note that Plaintiff admitted the School District's allegation that Plaintiff told Griffin that she could not locate the green folders for *some* of her students. *See* Movant's Statement of Material Facts, ¶ 41. In any event, I find this discrepancy is not material.

trickier for them than it would for the ESL teachers.  (Resp., Ex. 6 at 27:1-18, 30:17-25.)
This is because ESL teachers have different access rights to information in the
electronic student information system (called "Infinite Campus") about their students.
(Mot., Ex. E at 31:1-18.)  Unlike LASS employees, ESL teachers could pull their entire
class list up and look at class roster information, which would give them the language
proficiency codes, the student's grades, birth dates and other demographic information.
(*Id.*)  The only information kept in green folders that was not available to Plaintiff on
Infinite Campus was handwritten notes from previous teachers.

The School District contends that LASS's procedure when a green folder cannot
be found is to send the school a blank folder that has the template to which the ESL
teacher is to add basic biographical information he or she obtains from the Infinite
Campus system, by printing out the student report to place in the file.  The LASS
department policy was to not go back and try to recreate the entire history but to
maintain the file going forward.  (Mot., Ex. E at 34:5-8.)

Caddoo told Plaintiff that the department policy was not to print those folders.
Plaintiff told Griffin that she was having trouble getting green folders and that Caddoo
and LASS had been unresponsive to her needs.  Griffin said he would talk to LASS.
Griffin investigated Plaintiff's complaint about Caddoo and LASS not being responsive
and found insufficient cause for such concerns.  Griffin obtained blank green folders and
gave them to Plaintiff.  Plaintiff had to set up new green folders for the ones that could
not be located.

Plaintiff and the Silver Hills technology chairperson had repeated difficulties obtaining computer access for Plaintiff to access Infinite Campus.  Plaintiff testified in her deposition that this was resolved within a couple of weeks at the start of the school year.  (Mot., Ex. I at 46:1-9.)  Because she could not obtain computer access to Infinite Campus, Plaintiff states she created and maintained a separate filing system for information which would go into the green folders until they could be created manually.  (Resp., Ex. 1 ¶ 38.)

Caddoo offered to help Plaintiff set up the new green folders, but Plaintiff declined her help because she decided it would take more time to have Caddoo help than for Plaintiff to do it alone.  The effect on Plaintiff of not having the green folders was "It took me a little longer to get to know the students."

### The October 21, 2010 Meeting

Plaintiff's husband, a lawyer, wrote the School District on September 21, 2010, claiming the School District was violating the Settlement Agreement and threatening to turn the matter over to the EEOC.  The letter also alleged the School District was retaliating against Plaintiff by failing to provide her support and assigning non-classroom duties that cut into her planning periods.  I note that the Settlement Agreement on the 2010 Charge does not, however, actually address planning periods or non-classroom duties.  (Mot., Ex. A.)  Instead, it asks for documentation from her physician "listing in specific detail and/or all recommended restrictions as soon as practicable after July 15, 2010."  (*Id.*)  The record does not advise the Court what documentation, if any, was provided by Plaintiff's physician.

Hinson, the School District's Chief Human Resource Officer, Miller and the School District's attorney met with Plaintiff and her husband on October 21, 2010 to discuss Plaintiff's complaints.  At the meeting, the parties agreed Plaintiff would be relieved of non-classroom duties for the remainder of the trimester.  Plaintiff agreed she had no further requests for schedule accommodation.

Plaintiff's husband, Don Jacobson, testified in his affidavit that Hinson stated at the meeting that the School District had no concerns about the quality of Plaintiff's classroom performance.  (Resp., Ex. 2 ¶ 25.)  While the School District denies this, I find no merit to its contention that Mr. Jacobson did not show he had personal knowledge of this.

<u>Transfer of ELL Coordinator Caddoo</u>

Also at the October 21, 2010 meeting, Plaintiff asked that Caddoo be replaced because she failed to provide the support which Plaintiff had requested.  The parties agreed that a new LASS coordinator would be assigned to Silver Hills who would provide support to the teachers (including Plaintiff).

Also, several teachers had complained or voiced frustrations about working with Plaintiff.  Plaintiff states that Miller acknowledged at the meeting that he had not brought any complaints to Plaintiff's attention, and had taken no steps to resolve the issues.  (Resp., Ex. 1 ¶ 51.)  At the meeting, Miller agreed that if approached with complaints in the future, he would direct the complaining teacher to Plaintiff.

Plaintiff's husband testified in his deposition that he was concerned "because of the obvious enmity against Dr. Jacobson displayed by the LASS department, in light of

the refusal of the requested TOSA transfer earlier that year, and asked Mr. Hinson who would protect [Plaintiff] from 'political blowback' from the replacement of Karen Caddoo." (Resp., Ex. 2 ¶ 27.)  He further stated that "Mr. Hinson stated that Mr. Miller would see that there were not political repercussions from the LASS Department." (*Id.*) Plaintiff characterized it somewhat differently in her deposition.  She testified at the meeting that her husband, acting as an attorney, asked who would be her "building go-to person to prevent any retaliation, any negative politics in the building", and that Miller was designated as the person to whom she could go to if she had any concerns. (Reply, Ex. PP at 56:19-57:1.)  This discrepancy is not material.

Following the October 21 meeting, Hinson asked Dutch if a new ELL Coordinator could be assigned to Silver Hills in place of Caddoo.  Dutch conferred with LASS Assistant Director Erica Ramsthaler ("Ramsthaler") and they determined Caddoo could be replaced with Carrie Moore ("Moore") or Charlotte Wolf ("Wolf").  Moore had previously told them that she knew Plaintiff from when Plaintiff worked for the Mapleton School District and that Plaintiff didn't like her very much, so they assigned Wolf.[4]

<u>November 2010 Observation of Plaintiff in the Classroom</u>

By way of background, in 2007, the U.S. Department of Justice ("DOJ") audited the School District for compliance with the Equal Educational Opportunities Act. Regarding ESL services for students, Dutch testified that the DOJ's areas of concern

---

[4]  Plaintiff denies this entire paragraph as unsupported hearsay.  However, the fact that Dutch conferred with Ramsthaler as to who to replace Caddoo with is not hearsay.  As to what Moore had previously told Ramsthaler and Dutch, Defendants assert they are not offering this for the proof of the statement but as relevant to show why Ramsthaler and Dutch chose Wolf, rather than Moore, to replace Caddoo.  Thus, I find it is admissible.

included the duration of services ELLs were receiving, services for students who were dually identified as special education and English language learners, sheltered instruction for students during content area instruction, translation services for parents and families, curriculum and materials for the ESL program, and monitoring and training of administrators and school staff to meet the needs of English language learners.  The DOJ and the School District entered into an agreement that, among other things, required ELL Coordinators to provide training for all teachers for sheltered instruction and one hour of follow-up to help them implement the training.  The School District's agreement with the DOJ required the School District's ELL Coordinators to observe ESL teachers, including Plaintiff, in the classroom and provide feedback and training.[5]

Wolf observed one of Plaintiff's classes on November 18, 2010.  Plaintiff asserts that this observation did not include a prior discussion of the purpose of the observation nor of any support which would be offered to Plaintiff by Wolf as a result of the observation.  The School District denies this, pointing out that Wolf sent a previous e-mail to Plaintiff on November 2, 2010, in which Wolf said she looked forward to working with Plaintiff around common goals to helping her build on her strengths and to support her growth, and asked when they could meet in the following week to clarify some initial questions.  She also suggested times for the classroom observation.  (Reply, Ex. QQ.)

_____

[5] Plaintiff objects to the facts in this paragraph on the basis they are unsupported hearsay.  I reject this argument.   The DOJ's findings and concerns that were presented to Dutch (Mot., Ex. E, Dutch Dep. 14:9-15:8) are offered, according to the School District, only to show their effect, *i.e.*, the findings and concerns resulted in the School District entering into an agreement with DOJ which required ELL Coordinators to provide training and observe ESL teachers.  The School District's agreement with the DOJ is relevant to its argument that Wolf's observation of Plaintiff in the classroom and attempts to provide training were not done to retaliate against Plaintiff, as Plaintiff alleges, but to fulfill the School District's obligations under its agreement with the DOJ.

Plaintiff previously testified that she received this e-mail and that she and Wolf also agreed on a date and time for the observation, but something came up and Wolf could not conduct it on that date. (*Id.*, Ex. PP at 138:19-139:3.)

On November 19, Wolf sent Plaintiff an e-mail outlining what she had observed during her visit on November 18, listing questions, and asking for a response to her questions by November 23 so they could use the responses when they next met. (Mot., Ex. S.) Plaintiff asserts that the e-mail focused primarily on her shortcomings, but I note that the document speaks for itself. While Plaintiff objects to the tone of the e-mail, arguing that Wolf "sought to establish a false record of poor classroom performance", this is improper speculation as to Wolf's motive and is unsupported.

Plaintiff responded to Wolf's e-mail on November 22, 2010, discussing the problem she had with both the tone and substance of Wolf's e-mail. (Mot., Ex. S; Resp., Ex. 7.) She stated that she found the e-mail "personally and professionally offensive", and that Wolf could not be a resource to her without "a constructive professional relationship." (*Id.*) Plaintiff also attached a copy of her resume to her e-mail to give Wolf "a better understanding of my experience and expertise in the field." (*Id.*) Wolf forwarded this e-mail to Ramsthaler and copied Dutch. Dutch forwarded it to Hinson. (Resp., Ex. 6 at 58:6-25.)

Plaintiff's e-mail response to Wolf was discussed with Miller by Dutch. While Plaintiff alleges that Miller made no effort to intervene or to resolve the conflict, this is not supported by the cited evidence. Plaintiff also asserts that Miller responded to Dutch indicating that he already had determined that Dr. Jacobson's employment would

be terminated.  The actual evidence she cited to, however, is testimony by Dutch about a comment in quotes in the e-mail she forwarded to Hinson stating, "Amazing that someone is so willing to put the nail in their own coffin." (Resp., Ex. 6 at 59:4-6.)  Dutch did not remember that comment, and assumed that someone other than her had said it. (*Id.* at 59:6-9.)  She wrote the comment "as he said" it.  (*Id.*)  She assumed or guessed that Miller made the comment because she referred to him and because LASS always sends "information to him whenever there is an issue in terms of an employee that is kind of complaining about the support that we need to provide them, especially because of the DOJ requirements."  (*Id.* at 59:10-22.)

Also on November 22, 2010, Plaintiff told Miller that LASS coordinators were not her supervisors, and Miller told her that the coordinators did have supervisory authority to observe and give feedback on her classroom work.  Plaintiff referred to Wolf (who is of German descent) as a "Nazi."  Plaintiff told Miller she would not work with Wolf "under those conditions."  Miller concluded Wolf's approach was not out of line but that Plaintiff's response was.

Following the communication between Miller and Dutch, Plaintiff asserts that Wolf embarked upon a series of actions and communications intended to intimidate and harass her, even going so far as to demand that she perform work during the seven-day religious mourning period following the death of her father.  This assertion lacks foundation, is argument and/or is not supported by the evidence Plaintiff cites to.  In response to Plaintiff's advisement that her father was dying, Wolf stated in an e-mail of March 7, 2011, that she was sorry about Plaintiff's father's health situation, that her offer

for support still stands, and that Plaintiff should let her know by the end of the day on March 9 which day and period in the next week and a half (before spring break) that Plaintiff would like Wolf to come and observe her instruction.  (Resp., Ex. 8.)  She did not ask her to perform any work.  (*Id.*)  Moreover, Plaintiff was not a party to the communication between Miller and Dutch so her affidavit's allegations about that conversation are without foundation.

On December 6, 2010, Wolf sent an e-mail to Plaintiff responding to Plaintiff's objections, again requesting responses to her questions and suggesting they meet in person.  Plaintiff never responded to the questions raised by Wolf in her November 19 and December 6 e-mails and did not meet with Wolf to discuss the questions because Plaintiff "did not trust" Wolf.  This lack of trust was because in her November 19 e-mail, Wolf had "essentially sa[id] 'You don't know anything about teaching whatever.'"

<u>Additional Observations of Plaintiff</u>

On December 7, 2010, Griffin conducted his own observation of Plaintiff in the classroom and found that students disengaged toward the end of the class period.

On January 18, 2011, at 8:37 a.m., Griffin forwarded to Plaintiff an e-mail from Wolf advising that the LASS department would be conducting walk-throughs as required by the DOJ agreement.  That morning, Wolf, Griffin, and the assistant principal visited Plaintiff's classroom and observed Plaintiff teaching.  Assistant principals have the option of joining LASS coordinators when they conduct walkthroughs of teachers.

Plaintiff met with Griffin later in the day on January 18, 2011, and asked him what was going on.  She sent Griffin an e-mail after 5 p.m. that day saying Wolf had already

fulfilled her obligation under the DOJ agreement to meet with Plaintiff, alluding to the November observation.  Plaintiff does not know, however, if she ever read the DOJ agreement.

In the January 18 meeting and in January 18 and 27 e-mails to Griffin, Plaintiff asserted that the January observation was "punitive" because it was unannounced; that Wolf's demeanor toward Plaintiff during the observation was "antagonistic," "dismissive" and "personally threatening"; and that the walk-through was not legitimate because Wolf had observed Plaintiff the prior November and was "politically motivated."

Wolf sent Plaintiff an e-mail on January 31, 2011 regarding her observations made during the January classroom visit and asked Plaintiff to respond to questions. On February 24, Wolf e-mailed Plaintiff noting that she had not received a response to the questions in the January 31 e-mail.  Plaintiff never responded to Wolf's questions.

<u>Plaintiff's Mid-Year Review</u>

Griffin prepared the mid-year evaluation of Plaintiff's performance dated February 9, 2011, giving her a rating of "Satisfactory with Growth Needed."  He expressed concerns about Plaintiff's "relationship with the LASS department" and "the engagement of some students during observed lessons."  While Plaintiff asserts that student engagement issues "are especially common in middle school, and are not normally a basis for termination", this allegation is unsupported opinion.

Griffin delivered the mid-year review to Plaintiff in a meeting on February 11. During that meeting, Plaintiff said regarding Caddoo that Plaintiff had "asked for someone new and they sent that Nazi" (referring to Wolf).

Plaintiff spoke to Miller on February 15, 2011, about her unhappiness with, and rebuttal to, Griffin's evaluation.  Plaintiff felt the rating (which she had never received before in her career) was unfair, and complained both to Miller and Griffin.  Plaintiff asked Miller to change Griffin's evaluation to remove the discussion about her relationship with LASS, but Miller refused because Griffin had followed all the steps that he was supposed to follow in making the review.

Plaintiff sent an e-mail to Griffin rebutting her mid-year review that stated in part, "The entire conclusion and resulting rating are based upon data supplied by Charlotte Wolf, a staff development person."  Plaintiff alleges under the Master Agreement and School District policy that information from Wolf's observation could not be used by Griffin in his evaluation of Plaintiff because Wolf was "development staff" rather than an administrator.  The School District responds that Wolf was an administrator, she was not "development staff", citing Dutch's testimony to this effect.  (Mot., Ex. E at 11:18-12:3.)  While Plaintiff denies this, the deposition testimony of Dutch that she cites does not contradict her testimony that Wolf was an administrator.  (*See id*. at 9:11-10:6.)[6]  In further support of the School District's contention that Wolf was an administrator, it refers to Wolf's "Contract for Certified Administrative Position."  (Reply, Ex. SS, *see also* Ex. TT ¶ 9.)  Thus, I find the fact that Wolf was an administrator rather than "development staff" undisputed.

Plaintiff's attorney communicated with the School District's attorney about these matters.  Plaintiff asserts that her attorney sought a cooperative resolution, but was

---

[6] Plaintiff also cites to her own affidavit but the allegations she cites to do not support her denial.

rebuffed.  (Resp., Ex. 10.)  The School District denies this, stating that it responded promptly to each communication with explanation and information and offered to meet. (*Id.*)  Plaintiff further asserts, and Defendant denies, that the School District's attorney admitted that the contract between the teachers' union and the district expressly precluded the use of staff development input in Plaintiff's performance evaluation.

Plaintiff asserts that neither Griffin nor Miller ever undertook any effort to determine whether her complaints were justified.  The only testimony she cites that supports this allegation is that Miller told Plaintiff he would not overturn her performance valuation.  (Resp., Ex. 3 at 33:13-24.)

Plaintiff alleges that Griffin's records falsely claim that she refused to sign the review document (Resp., Ex. 9) when, in fact, per the Master Agreement, Plaintiff had agreed to sign the document when she submitted the rebuttal.  She asserts that Griffin told her orally that she need not sign it until her rebuttal had been attached.  The School District denies this, as Exhibit 9 shows that Plaintiff submitted her rebuttal unsigned and without stating she was ready to sign the evaluation.  However, in her February 18, 2011 e-mail to Griffin, Plaintiff stated that she did not refuse to sign the evaluation papers, and that Griffin told her to hold off until she had written the rebuttal.  She further stated therein that she would sign the papers.  (*Id.*)

Griffin and Plaintiff met on February 18, 2011, to develop the improvement plan necessitated by the Satisfactory with Growth Needed rating.  Plaintiff told Griffin that he was being "played" by the LASS department so that LASS could politically attack her, meaning that Dutch wanted Plaintiff gone, though Plaintiff had "no idea" why.

Griffin told Plaintiff that an improvement she was required to make was to work with LASS department members in a more professional manner.  Plaintiff asked Griffin to remove this requirement from the improvement plan because, in her pre-appraisal agreement, "I had specifically worded that my goals for the year would be to work with Karen Caddoo to discuss planning curriculum and resources. It did not -- and I specifically did not say at that time that I wouldn't meet with anybody in the LASS department."

In the February 18 meeting, Plaintiff also objected to working with several of the personnel Griffin had identified as resources for Plaintiff for her improvement plan, saying that she had contentious relationships with them.  Griffin made the changes in personnel requested by Plaintiff.

<u>Plaintiff's Request for Wolf To Be Replaced</u>

Wolf spoke to Dutch in November 2010 about Plaintiff's unhappiness over Wolf's classroom visit and shared copies of the e-mails they had exchanged.  Dutch contacted Griffin at that time and asked whether there was an issue with Wolf working in Silver Hills.  Griffin reported that the teachers were really happy with her and her work, acknowledged that Plaintiff was the exception, and asked Dutch not to pull Wolf.[7]

Plaintiff asked Miller to replace Wolf with Moore, but the School District did not grant that request.  When the School District replaced Caddoo at Plaintiff's request in

---

[7]  Plaintiff denies this last sentence on the basis that it is unsupported hearsay.  I reject this argument as she does not cite to any specific out of court statements offered to prove the truth of the matter asserted.

October, it had considered appointing Moore but decided not to because Moore had previously reported that Plaintiff did not like her very much.[8]

Wolf was assigned to Silver Hills not only to support Plaintiff, but to support all the teachers, and Dutch was not willing to change Wolf's assignment for just one person.

<u>Meetings of Plaintiff and Wolf</u>

Plaintiff attempted to resolve her differences with Wolf via direct meetings.  Wolf did not refuse to work with Plaintiff.  The February 24, 2011, e-mail to Plaintiff requested a date and time for Wolf to observe instruction in one of Plaintiff's ESL classes and a date and time for a face-to-face debriefing.  They decided to meet on March 14, 2011.  Both Plaintiff and Wolf attended this meeting.  Plaintiff sent Wolf an  e-mail the day after the meeting "to recap" and sent a copy to Griffin.  Wolf sent an e0mail to Ramsthaler, with a copy to Dutch, on March 14 reporting on the meeting.[9]  At the end of that meeting, Wolf and Plaintiff agreed to an April 4 meeting.  (Reply, Ex. PP at 77:19-20.)

On March 28, 2011, Dutch e-mailed Miller, Griffin, Hinson and Ramsthaler, forwarding the meeting notes and stating that Dutch was "unwilling to subject one of [her] coordinators to any more abuse like this."  Dutch had instructed Wolf not to work with Plaintiff, and notified Miller that the LASS department would not work with her.

---

[8]  While Plaintiff objects to what Moore had reported as unsupported hearsay, I reject this argument.  It is not offered for the truth of the matter, but to show why Dutch and Ramsthaler chose Wolf, rather than Moore, to replace Caddoo.

[9]  While Plaintiff objects to this document as hearsay, it appears to be admissible as a business record under Fed. R. Evid. 803(6).

Wolf did not attend the scheduled meeting with Plaintiff in April 2011.  Wolf falsely stated that she had forgotten about the meeting.

<u>Nonrenewal of Plaintiff's Contract</u>

"Nonrenewal" is the process by which the School District implements a decision not to reemploy a probationary teacher following expiration of a one-year contract.  The school principal makes a recommendation to the Human Resource Department if the principal believes a probationary teacher's contract should not be renewed.

Griffin's job duties included observing teachers in their classrooms.  Griffin had formally observed Plaintiff in the classroom twice in the first semester, once in the second semester and had conducted numerous walk-throughs.  Griffin had noted that not all of Plaintiff's students were engaged in the lessons he observed.  However, Griffin's final observation before Plaintiff's non-renewal reflected no criticism of Plaintiff's classroom performance.  Also, as summarized above, Griffin and Miller were aware of communications between Plaintiff and Wolf evidencing a poor working relationship.[10]

On April 21, 2011, Miller and Griffin met with Plaintiff and informed her that they were making a recommendation to not renew her contract for the next year.  Miller and Griffin told Plaintiff that they based their recommendation on her failure to build a positive relationship with the LASS department and her failure to improve on increasing student engagement in her classroom to a level that Griffin felt was needed.  Miller told Plaintiff that Dutch had instructed her department not to work with Plaintiff.

---

[10] However, on May 13, 2011, Griffin, in Miller's presence, stated that he was comfortable relying upon Plaintiff's professional judgment as to the transition of ESL students out of the ESL program.

Based on recommendations made by the Superintendent of the School District, the Board of Education took action, at its meeting on May 25, 2011, to non-renew the contracts of 134 probationary teachers.  Like Plaintiff, 31 of the nonrenewed teacher had been rated as "Satisfactory with Growth needed".

Plaintiff's Second EEOC Charge and The Present Action

In June 2011, Plaintiff filed a second EEOC Charge against the School District alleging retaliation in violation of the ADA.

Plaintiff filed the Complaint in this case on March 21, 2012.

III.   ANALYSIS

A.   Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *E.E.O.C. v. Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party.  *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1190.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Atl. Richfield Co. v. Farm Credit Bank of*

-28-

*Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Id.* (quotation omitted). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

      B.    <u>The Merits of the Motion</u>

          1.    <u>The Retaliation Claim</u>

      The ADA prohibits retaliation against persons who have opposed any act or practice made unlawful by the ADA "or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). In the absence of direct evidence of retaliation, ADA retaliation claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Reinhardt v. Albuquerque Public Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010). Under that framework, Plaintiff first must establish a prima facie case of retaliation by demonstrating that (1) she engaged in protected opposition to discrimination, (2) the employer imposed action that a reasonable employee would have found to be materially adverse and (3) a causal connection existed between the employee's protected activity and the employer's materially adverse action. *Id.; see also McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. *McGowan*, 472 F.3d at 741. "If the employer does so, the burden shifts back to the plaintiff to show that the employer's reasons are pretextual". *Id.*

### a.    Whether Plaintiff Has Established a Prima Facie Case

Here, there is no dispute that Plaintiff engaged in protected action. The issue is whether the other two elements of a prima facie case are established.

### i.    Adverse Action

The School District argues that Plaintiff has not demonstrated materially adverse action. This can be shown by actions that "'might well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted). An action must be material in order "to separate significant from trivial harms." *Id.* "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Whether a particular action is materially adverse "depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* at 71 (quotation and internal quotation marks omitted).

Plaintiff first references as an adverse action the LASS Department's refusal to provide information it could easily have had printed and provided to Plaintiff in the green folders, as it had done the previous year. I find that failure to provide the green folders

to Plaintiff does not rise to the level of materially adverse action.  Plaintiff admits the information to recreate the files was to be found on the computer in "Infinite Campus". After the first couple of weeks of the 2010-2011 school year, Plaintiff "was able to do what I needed to do with" Infinite Campus.  (Mot., Ex. I at 48:5-10.)  Moreover, Caddoo offered to help Plaintiff recreate the folders.  I find from the foregoing that a reasonable person would not find LASS's refusal to recreate the folders for Plaintiff to be materially adverse.[11]

Plaintiff also argues that from the outset, school administrators Miller and Griffin began keeping notes whose only purpose was to create the justification for termination of Plaintiff's contract.  She also asserts that there were omissions of fact which render the notes misleading, in not plainly false, such as her "late" arrival at lunch duty.  I find that these allegations are not properly supported.  Plaintiff does not identify or produce any such notes, including those that supposedly omit material facts "as to the "late" arrival at lunch duty.  Nor does Plaintiff discuss the actual content of the notes.  Instead, as discussed in Section II, *supra*, she makes unsupported and speculative arguments about the meaning and purpose of the notes.

Further, Plaintiff has not shown that the notes had any impact on her employment, and I find that the notes would not have dissuaded a reasonable employee from making or supporting a charge of discrimination.  *White*, 548 U.S. at 71.  In so finding, I note that for purposes of a retaliation claim, "materially adverse action"

---

[11] I acknowledge that Plaintiff argues that these actions were taken solely for the purpose of harassment and to make Dr. Jacobson's work harder.  Regardless of whether this is true, Plaintiff must still show that the actions were materially adverse.

requires injury rising to a "'level of seriousness.'"  *Daniels v. UPS*, 701 F.3d 620, 638

(10th Cir. 2012) (quotation omitted).  "While the employer's conduct need not affect the

terms and conditions of employment, *White*, 548 U.S. at 64, the inquiry is an objective

one, and not based on a "'plaintiff's personal feelings.'"  *Id.* (quotation omitted).

Plaintiff also refers to the fact that Assistant Principal Griffin made an outright

falsehood concerning the signature of her evaluation.  She alleges that Griffin's records

of the mid-year evaluation falsely claim that Plaintiff refused to sign the review

document.  In support, she cites Exhibit 9 which includes the evaluation on which Griffin

wrote "refused to sign," an e-mail from Plaintiff objecting to those words, and Griffin's e-

mailed reply explaining why he wrote it and that he will provide a copy for her to sign.

(Resp., Ex. 9 at 8 of 9.)  Again, Plaintiff has not shown that this had any effect on her

employment, and I find that a reasonable person would not find this materially adverse.

Plaintiff next asserts, citing only her and her husband's affidavits, that Principal

Miller did nothing to incorporate Plaintiff into the school team.  When he learned of

conflict with other staff, he did nothing to address it.  He did not investigate the facts.

He neither informed Plaintiff of the complaints nor inquired as to her understanding of

events.  He never entertained the possibility that she might be the one "in the right."  He

did nothing to follow-up on his assistant principal's supposed "handling" of the issues,

and did nothing to resolve the issues.  I find these facts are conclusory and are not

supported by the evidence.

Plaintiff admits that when she complained about working with LASS Coordinator

Caddoo, the School District replaced Caddoo.  She also admits Miller told her there

were a number of people who were very upset with her.  (Resp. at 13 ¶¶ 44-45, 48;

Mot., Ex. I at 49:3-8, 95:9-22.)  Miller testified that he continued to receive complaints

from others about Plaintiff and directed them to talk to Plaintiff, that he talked to the ELL

Department about complaints Plaintiff made to him about Wolf, and that he stayed

informed about Griffin's efforts to keep Plaintiff and the ELL Department on track.  (Mot.,

Ex. F at 25:17-28:14.)  Miller did not personally take additional steps to try to resolve her

conflicts with others because Griffin was engaged in constant efforts to keep Plaintiff

and others on track.  (*Id.*)  While Miller admits that he did not change the evaluation, this

is because Griffin had taken all the steps he was supposed to in connection with the

evaluation and Plaintiff has not shown to the contrary.[12]

Plaintiff further references the fact that shortly after the October 21 meeting,

Miller, who Hinson purportedly assigned to protect Plaintiff from political repercussions

from the LASS Department, wrote to Dutch, the Director of the LASS Department,

commenting that Plaintiff had put "the nail in her own coffin;" terminology commonly

understood as referring to confirmation of a death or failure that had already become

inevitable.  She asserts that a jury could easily determine that Miller had decided by

November that Plaintiff's contract would not be renewed, and that the proximity of that

decision to the October 21 meeting established that the decision was made in retaliation

for her insistence on the accommodation that the School District had agreed upon and

---

[12] For his part, Griffin obtained green folders and extras for Plaintiff, followed up on complaints about Plaintiff made by individuals in the LASS Department and several office staff by reviewing e-mails Plaintiff provided and talking to the people involved, and replacing Caddoo.  (Reply, Ex. OO at 20:3-9, 20:8 - 30:14, 67:21 - 68:110, 74:21 - 75:5.)

that he had refused to provide.  I find the evidence does not actually support Plaintiff's

argument.  First, it is unclear who actually said that Plaintiff had put "the nail in her own

coffin."  Dutch did not remember that comment which was quoted in the e-mail, and

merely assumed or guessed that Miller had made it.  This was never substantiated,

however, in the record.  Moreover, even assuming that Miller did make that comment,

this does not show that Miller made the decision in November 2010 to terminate

Plaintiff, especially in light of the fact that Plaintiff was not terminated at that time but

remained an active employee through the end of her contract.

Plaintiff further contends that at the October 21 meeting, Hinson and Miller

offered no criticism of her classroom performance; each stating affirmatively that her

classroom performance was satisfactory.  After the October 21 meeting, however, the

School District began a program of harassment and intimidation, created a false record

of unsatisfactory classroom performance, downgraded Plaintiff's midyear evaluation

based upon factors expressly precluded by the contract between the district and the

teachers' union, and ultimately terminated her employment.  She further asserts that the

School District admits that the termination was not based upon Plaintiff's classroom

performance, but rather upon the decision of the LASS Department which should have

 had no input into the issue.  Plaintiff argues that the jury could easily conclude that

these events are causally related, and were retaliatory.

I find that Plaintiff's termination was a materially adverse action.  As to the other

actions complained of in the previous paragraph, the allegation that after the October

21, 2010 meeting the School District "began a program of harassment and intimidation"

is a mere conclusion and can thus not constitute an adverse action.  Also, while Plaintiff argues that the School District "created a false record of unsatisfactory classroom performance", she cites in support only her own opinion in her affidavit that her evaluations were false.  It is not enough, however, that an employee disagrees with her evaluations.  "[I]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [her] own relative performance."  *Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1266 (10th Cir. 2001).  Plaintiff has not cited to evidence from other witnesses that the evaluations were false.  *Id.*

Finally, as to the assertion that the School District downgraded her midyear evaluation based upon factors expressly precluded by the contract between the district and the teachers' union, again the evidence does not support this.  The classroom observations of Plaintiff conducted by Griffin, Wolf and others complied with the requirements of the collectively-bargained Master Agreement, School District policy, and the DOJ Agreement.  The Master Agreement expressly permitted observations that are not scheduled in advance.  It required a minimum of two observations for Plaintiff's first evaluation cycle and a minimum of one observation during her second evaluation cycle, and authorized administrators to do more.  The evidence shows that Plaintiff received only the minimum number of formal observations.  Wolf's role in observing Plaintiff in the classroom and providing feedback was consistent with the requirements of the DOJ Agreement.  Plaintiff has presented no basis in fact for claiming Wolf was development staff rather than an administrator.  Further, the mid-year evaluation was based upon the observation Griffin had made independently on December 7.  The

School District's adherence to the Master Agreement was adverse in the sense that it documented deficiencies in Plaintiff's performance, but it was not materially adverse in the manner necessary to show a prima facie case of retaliation.

ii.     Causal Connection

Even though there is at least one materially adverse action—Plaintiff's termination from employment, I find that there is not a causal connection between Plaintiff's protected activity and that adverse action (or any other adverse action). To establish a causal connection, Plaintiff must show that the individual who took adverse action against her knew of her protected activity. "Unless an employer knows that an employee is engaging in protected activity, it cannot retaliate against the employee because of the protected conduct, as required by statute." *Jones v. UPS, Inc.*, 502 F.3d 1176, 1194-95 (10th Cir. 2007). In the case at hand, Miller and Griffin, the individuals who recommended that Plaintiff's contract not be renewed, submitted affidavits that they were not aware of Plaintiff's 2010 Charge. While they did have knowledge of her request for accommodation in connection with a planning period, Plaintiff presented no evidence that the Board of Education, the final decision maker regarding Plaintiff's employment, had any knowledge of Plaintiff's accommodation request. Plaintiff also presented no evidence that Dutch or other LASS employees had any knowledge of Plaintiff's request for accommodation or any reason to engage in retaliatory conduct prohibited by the ADA.

Also, if the materially adverse action is not "very closely connected in time to the protected activity" a plaintiff "must rely on additional evidence beyond temporal

proximity to establish causation." *Anderson v. Coor's Brewery Co.,* 181 F.3d 1171,

1179 (10th Cir. 1999).  The time between the EEOC charge in January 2010 or her

request for accommodation in August 2010 and her termination in April 2011 is too long

to raise an inference of causation.  *See E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028,

1051 (10th Cir. 2011) (citing cases that a gap of three or four months is insufficient).

Plaintiff has not presented additional evidence that establishes causation.  Thus, she

identifies no facts to show her contract would have been renewed but for her request for

longer planning periods.  Further, this argument does not make sense in light of the

facts that the School District renewed Plaintiff for the 2010 -2011 school year, granted

her preference to move to a middle school, granted her request to remove Caddoo and

to be excused from lunch duty, and granted her request not to be work with several of

the school personnel Griffin had identified as resources for Plaintiff's improvement plan.

Plaintiff also provides no corroboration for her perception that her work performance

was satisfactory.

      b.    <u>Whether Plaintiff Showed that the School District's Actions Were
Pretextual</u>

     I also find that the School District presented legitimate, nondiscriminatory

reasons for each of its actions at issue.  As grounds for her termination, the School

District contends that Plaintiff had a poor working relationship with the LASS ELL

coordinators assigned to work with her, and both Wolf and Griffin independently

observed what they felt was the disengagement of students in Plaintiff's classroom.

Plaintiff's response does not even address the issue of pretext; thus, she did not attempt to explain how the list of legitimate non-discriminatory reasons for the School District's actions contained in its motion were pretexual.  She offers no evidence to show that her managers did not believe her performance needed improvement.  She offers no evidence to show Dutch's decision not to require LASS employees to work with Plaintiff was for any reason other than Plaintiff's abusive treatment of LASS coordinators.  In short, Plaintiff has not carried her burden of proving that the School District's reasons for not renewing her contract were "'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are[ unworthy of belief.'" *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1211 (quotation omitted).  "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment."  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).[13]

Based upon the foregoing, I find that summary judgment is appropriate as to the retaliation claim.

### 2.    The Claim Based on Breach of the Settlement Agreement

Plaintiff asserts in her response that there is no dispute that the parties entered into a settlement agreement terminating her complaint with the EEOC based on the fact that the School District had failed to grant reasonable accommodation while Plaintiff was employed at Malley.  She then argues that there are genuine issues of material fact

---

[13] I also note that Plaintiff does not deny that her students were disengaged in the classroom but attempts to excuse it by arguing this is common and not a reason for termination.  While Plaintiff clearly has a different opinion of her performance than the School District did, her subjective evaluation of her performance is not relevant, as discussed above.  *Selenke*, 248 F.3d at 1266.  Plaintiff also has asserted the School District subjected her to performance requirements inconsistent with policies and agreements, but failed to identify evidence of such a failure.

as to the terms of the settlement, and the representations made by the School District to induce her enter into the settlement.  Further, she asserts that there is no dispute that the School District refused to provide the planning period accommodation requested by her in the August 2010 meeting with Miller before the 2010-2011 school year began. Plaintiff argues that there is a dispute whether that accommodation was part of the earlier settlement agreement, or constituted a new request for accommodation, and that under these circumstances, summary judgment is not proper.  She further asserts that these issues exist without regard to the claim for retaliation.

I grant summary judgment as to this claim.  First, Plaintiff did not plead a breach of the settlement agreement, which is a separate contract claim.  Thus, these matters are not material to Plaintiff's claims of retaliation.  Second, the Settlement Agreement that is attached to the motion does not state that planning periods are required as an accommodation, and there is no evidence in the record from which I could find that such an accommodation is required under that Agreement.  Thus, I find there are no genuine issues of material fact on that issue.  Finally, entitlement to planning periods under a settlement agreement is immaterial to establishing entitlement under the ADA at the time of the alleged retaliation.  A causal connection between protected conduct and material adverse action is also necessary to establish retaliation for engaging in protected activity.  Adverse action predating the protected conduct is also immaterial: alleged representations made in July and the terms of an agreement entered into that month cannot be adverse actions based on later conduct that occurred in August or October, 2010, or thereafter.

IV.     <u>CONCLUSION</u>

Based upon the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment (ECF No. 31) is

**GRANTED**.  Judgment shall enter in favor of Defendant and against the Plaintiff.  It is

FURTHER ORDERED that the five-day jury trial set to commence on Monday,

September 15, 2014, and the Final Trial Preparation Conference set on Friday, August

22, 2014, at 10:00 a.m. are **VACATED**.

Dated:  March 31, 2014

BY THE COURT:


<u>s/ Wiley Y. Daniel</u>
Wiley Y. Daniel
Senior United States District Judge